UNITED STATES of America, Plaintiff–Appellant,

v.

Ella M. ANDRUSKA, Defendant–Appellee.

No. 91–2748.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1991.

Decided May 18, 1992.

Frederick J. Hess, U.S. Atty., Ralph M. Friederich, Robert T. Coleman, and Kit R. Morrissey (argued), Asst. U.S. Attys., Office of the U.S. Atty., Crim. Div., Fairview Heights, Ill., for plaintiff-appellant.

James Hackett (argued), Edwardsville, Ill., for defendant-appellee.

Before FLAUM and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*

FLAUM, Circuit Judge.

A jury found Ella Andruska guilty of concealing fugitive Thomas Taylor from arrest in violation of 18 U.S.C. § 1071. At sentencing, the district court called her behavior "aberrant" and departed downward from the Sentencing Guidelines' applicable sentencing range. The government appeals that departure, contending the court failed to provide the required notice of its intent to depart and its grounds for doing so, and that the finding of aberrant behavior is unsupported by the record. We vacate the sentence and remand for resentencing.

## I.

About a year after landing a sales job at a local car dealership, Ella Andruska took up with Thomas Taylor, separated from her husband, and moved into her own apartment. At the time, Taylor was the leader of the Wind Tramps Motorcycle Club—an organization whose activities apparently included cocaine trafficking. Drug transactions took place both at club headquarters and at Taylor's home, located next door. Andruska, a regular visitor of both locations, was aware of the group's enterprises, and bought and used cocaine supplied by club members.

The government, too, knew of the Wind Tramps' illicit endeavors, and on April 19, 1990, law enforcement officials raided the clubhouse and arrested several members on federal warrants for cocaine trafficking and related charges. Authorities were unable to locate Taylor, however, and initiated a search. Andruska was with Taylor at a tavern when news of the raid and the

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

arrests—along with a picture of Taylor—appeared on the television set. She also heard word of the arrests and the search for Taylor in a telephone conversation that evening.

Over the next few months, Andruska maintained contact with several club members (who had been arrested and released on bond or held pending trial) regarding Taylor's whereabouts and well-being. She drove him to Florida sometime between May 27 and June 1—later claiming that, although she knew he "had a lot of problems" and was "in trouble," she thought he was in trouble for marijuana. According to Andruska, the trip was unplanned, and Taylor contributed less than $300 for expenses while she provided the transportation and charged to her credit card the rooms, fuel, and clothing.

After receiving information that Taylor might be with Andruska, state and federal agents in July 1990 began a surveillance of her apartment. Taylor spent the night there on July 16, at which time, according to Andruska, she encouraged him to get some legal advice. The following night at about 10:00 p.m., agents observed Andruska's red 1987 Camaro, bearing "Ella 87" Illinois license plates, leaving the apartment complex's parking lot. After identifying Andruska and Taylor as the driver and passenger, the agents radioed for the assistance of state troopers in marked squad cars.

A uniformed trooper stopped Andruska's car on westbound Interstate 270 shortly thereafter, and ordered Andruska and Taylor to place their hands on the inside roof of the car. Andruska complied; Taylor did not. Taylor then appeared to say something to Andruska—in response to which she dropped her hands, sped away from the scene, and drove a short distance before losing control of the car and coming to a halt. Although Andruska remained in the car, Taylor fled on foot. Agents took Andruska into custody and combed the area for Taylor. Upon questioning, she denied that her passenger was Taylor or that he was armed, and asserted instead that she carried a passenger named "Billy." When

apprehended later that night, Taylor was armed with a loaded 9 millimeter semiautomatic pistol.

After Taylor's apprehension, authorities took Andruska to police headquarters where she was advised of her rights and agreed to give a statement. She admitted in the signed statement that Taylor was her passenger and that she knew he was wanted by the police. She further stated that Taylor had spent the previous evening at her apartment, and that she was taking him to St. Louis for drinks when they were stopped by the trooper. Andruska stated that she had used the name "Billy" when asked who her passenger was because that was the name Taylor was using at the time.

The government filed a criminal complaint against Andruska the following day. After her arraignment, she was released on an unsecured $5,000 bond with the condition that she avoid all contact with the Wind Tramps, and specifically with Taylor. The grand jury returned a one-count indictment against her on August 22. Later, after learning that Andruska had regularly visited Taylor at the county jail—gaining access by calling herself "Ella Crocket" (her maiden name)—the government filed a motion to revoke her release order, which the district court granted. A grand jury returned a superseding indictment in February 1991, and, following a four-day trial in April 1991, a jury found Andruska guilty of concealing a person from arrest in violation of 18 U.S.C. § 1071.

At sentencing, Andruska testified that she had been unaware of Taylor's illegal activities and fugitive status. She maintained her innocence throughout the sentencing hearing, and further stated that every witness in the trial against her had lied. Regarding the events leading up to Taylor's capture, Andruska stated that he had stayed with her July 16 and 17, that they had discussed his "situation," and that she had told him to "get a good lawyer" and "get himself straightened out." Sentencing Tr. at 44. She said she sped away from the scene and lied about Taylor's identity because she was afraid for his life, and that her written statement "did not come

out like I put it." *Id.* at 48. As to her visits with Taylor in violation of the terms of her release on bond, Andruska claimed she "didn't know by going to see Tommie that I would go to jail." *Id.* at 25.

The district court found Andruska's testimony not credible. It also rejected her objection to the portion of the presentencing report finding that she was not entitled to a two-level adjustment for acceptance of responsibility, ruling there had "been no demonstration of acceptance of responsibility for her criminal conduct." *Id.* at 67. The report assigned Andruska a criminal history category of I which, combined with an offense level of 30, resulted in an applicable sentencing range under the Guidelines of 97–121 months. The court accepted this calculation, and, after recognizing that 18 U.S.C. § 1071 provides a maximum sentence of 60 months, found 60 months the appropriate sentence pursuant to § 5G1.1 of the Guidelines. However, determining that Andruska's behavior was "aberrant," the court, *sua sponte*, then proceeded to depart downward to an offense level 22, with a Guidelines range of 41–51 months, and sentenced Andruska to a 42–month term of imprisonment.

## II.

Our first task is to determine whether the district court gave the government sufficient notice of its intent to depart downward from the appropriate Guidelines range on a ground not raised by either of the parties. *Burns v. United States,* —— U.S. ——, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), held that a district court must give the defendant "reasonable notice" before it can depart upward on a ground not identified either in the presentence report or in a prehearing submission by the government. *Id.* 111 S.Ct. at 2187. That notice "must specifically identify the ground on which the district court is contemplating an upward departure." *Id.* At issue here is the converse proposition: whether the district court must give notice to the *government* before it can depart *downward* on a ground not raised by either party.

The petitioner in *Burns* had entered into a plea agreement with the government, which stated the parties' expectation that Burns would be sentenced within the Guidelines range corresponding to an offense level of 19 and a criminal history category of I. *Id.* at 2184. The probation officer confirmed this expectation in Burns' presentence report, and found the applicable sentencing range to be 30–37 months. The report concluded: "There are no factors that would warrant departure from the guideline sentence." *Id.* Although neither the government nor Burns had filed any objections to the presentence report, at the conclusion of the sentencing hearing the district court announced that it was departing upward from the Guidelines sentencing range (for reasons not relevant here) and sentenced Burns to 60 months' imprisonment.

Burns claimed Fed.R.Crim.P. 32 required the district court to give advance notice of its intent to depart *sua sponte* from the Guidelines; the Government claimed it did not. Rule 32 provides, among other things, that at the sentencing hearing the district court "shall afford the counsel for the defendant and the attorney for the Government an opportunity to comment upon the probation officer's determination and on other matters relating to the appropriate sentence." Fed.R.Crim.P. 32(a)(1). The Supreme Court agreed with Burns. Of particular relevance, the Court framed the issue not only as whether a defendant is entitled to notice, but also, in dicta, as whether the government should be so apprised:

> It is equally appropriate to frame the issue as whether the *parties* are entitled to notice before the district court departs upward *or* downward from the Guidelines range. Under Rule 32, it is clear that the defendant and the Government enjoy equal procedural entitlements.

*Burns,* 111 S.Ct. at 2185 n. 4 (emphasis in original).

■ Which brings us to the instant case. Now sitting on the other side of the fence, the government argues that Rule 32—in light of *Burns*—required the district court

to notify the government of its intent to depart downward and its grounds for doing so. Although a few post-*Burns* cases address the notice issue, all do so from the vantage point of a defendant faced with an upward departure, *see, e.g., United States v. Hill,* 951 F.2d 867 (8th Cir.1991), *petition for cert. filed* (Mar. 6, 1992); *United States v. Bachynsky,* 949 F.2d 722 (5th Cir.1991), *reh'g en banc denied,* 954 F.2d 723 (1992); *United States v. Andrews,* 948 F.2d 448 (8th Cir.1991); none address whether the government likewise must receive notice of a court's plans to depart downward on its own motion. The clear directive of *Burns* is that it must.

Andruska relies on *United States v. Jordan,* 890 F.2d 968 (7th Cir.1989), to support her argument that notice was unnecessary in this case. The defendant in *Jordan* had argued that the district court failed to inform him in advance that it would be departing from the Guidelines range; we determined that, so long as the defendant was "not unfairly surprised" with new evidence or information, the district court was free to announce its sentence in compliance with the Guidelines and other applicable law. *Id.* at 975. *Jordan,* however, was a pre-*Burns* case, and to the extent it conflicts with *Burns, Burns* is controlling.

Here, Andruska's presentence report concluded, as had Burns', that "[t]he probation officer has not identified any information that would warrant a departure from the guidelines." Andruska's counsel objected to the report on three specific grounds, none of which became the basis for the district court's downward departure. Instead, the district court stated that Andruska's behavior was "abberant [sic] and it was unusual, out of the ordinary" for her. *See* Sentencing Tr. at 79. The court left no room for doubt that aberrant behavior—a ground neither identified in the presentence report nor proffered by the parties—was the basis for departure. *See id.* at 79–80 ("And for that reason, and only that reason, I am going to grant the defendant's motion for a downward departure. I am going to grant that downward departure on the grounds of abberant [sic] behavior, because I do not believe that it is

properly covered by the guidelines and it is suggested in the guidelines by Chapter 1, Part A."); *see also* Crim. Judgment, App. at 4 ("defendant's conduct constituted aberrant behavior and no adequate provision is contained in the Guidelines on this issue."). Because the government did not receive the notice to which it was entitled under Rule 32, the judgment of the district court is reversed and the case remanded for further proceedings. Should the district court contemplate a departure on remand, it must provide reasonable notice that it is contemplating such a ruling, and specifically identify the ground upon which it may depart.

### III.

■ Because the issue undoubtedly will arise on remand, we also address the government's claim that the district court's stated basis for departure—Andruska's aberrant behavior—was unsupported by the record and therefore improper. In reviewing a departure under the Guidelines, we first determine whether it was imposed in violation of law or as a result of an incorrect application of the Guidelines (considered in light of the relevant policy statements) that govern departure decisions. If so, a remand is required. If, however, we conclude that departure is proper, we must then look to whether the extent of the departure is unreasonable. *Williams v. United States,* — U.S. ——, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992); *see* 18 U.S.C. § 3742(f)(1), (2). Here, we find that the district court incorrectly applied the Guidelines in departing.

■ A district court may depart from the Guidelines' presumptive sentencing range only when it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *See* 18 U.S.C. § 3553(b). The Guidelines state specifically that the Commission "has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures," Ch. 1, Pt. A, Intro. ¶ 4(d), and, accordingly, permit a sentencing court to depart from

the applicable range where it finds such behavior.

In *United States v. Carey*, 895 F.2d 318 (7th Cir.1990), we held that a defendant's behavior, to be considered "aberrant" within the meaning of the Guidelines, "must be more than merely something 'out of character' or the defendant's first offense." *Id.* at 325. "A single act of aberrant behavior," we observed in *Carey*, "generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning because an act which occurs suddenly and is not the result of a continued reflective process is one for which the defendant may be arguably less accountable." *Id.*

Since our opinion in *Carey*, the Ninth Circuit has taken a broader view of the type of behavior that might be considered "aberrant" under the Guidelines, recognizing what it terms the "aberrant behavior spectrum." *See United States v. Dickey*, 924 F.2d 836, 839 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991); *United States v. Takai*, 941 F.2d 738, 743 (9th Cir.1991). In *Takai*, two defendants had conspired and bribed an immigration official in an attempt to obtain green cards for relatives and friends. The court acknowledged that the absence of prior convictions, in itself, is insufficient to establish that an act is "single and aberrant," but proceeded to find the defendants' behavior—which involved multiple incidents occurring over an approximately six-week period—to be aberrant. *Takai*, 941 F.2d at 743. Rejecting the government's contention that any first offender could make the argument proffered by the defendants, the court laid out its analysis as follows:

> [I]f one lays stress on the phrase "single act" it appears that each [defendant] fails the test because each obviously performed a whole series of actions leading up to the final action. . . . On the other hand, it is fair to read "single act" to refer to the particular action that is criminal, even though a whole series of acts lead up to the commission of the crime. In this case, there are two crimes—the forming of the conspiracy and the offer

of the [bribe]. The conspiracy and the offer are so closely related that for purposes of deciding whether they were aberrant they constitute a single act.

*Id.* Noting that the defendants had accepted responsibility and expressed sorrow, that the government official had influenced the defendants' decisions to continue playing a pivotal role, and that the defendants did not seek pecuniary gain, the court found that a factual predicate existed for the district court's downward departure. *Id.* at 741–42.

The Ninth Circuit's approach has been discounted explicitly by the Fourth Circuit, *see United States v. Glick*, 946 F.2d 335, 338–39 n.* (4th Cir.1991) ("We do not agree with the approach of the Ninth Circuit that a series of actions calculated to further criminal misconduct can be classified as aberrant behavior.") and at least implicitly in the Eighth. *See United States v. Garlich*, 951 F.2d 161, 164 (8th Cir.1991) (criminal conduct spanning one year and several transactions not aberrant behavior; defendant's "actions in planning and executing [a] financing scheme over a one-year period were not 'spontaneous and seemingly thoughtless.'" (quoting *Carey*, 946 F.2d at 338)). We, too, respectfully disagree with the Ninth Circuit's view.

It is admittedly difficult to discern precisely what the Sentencing Commission intended in drafting the "aberrant behavior" reference. At the very least, we can surmise that the Commission intended a limited application of the principle. As a general matter, we must consider the Guidelines, policy statements, and official commentary in determining whether a circumstance was adequately taken into consideration by the Commission, *see* 18 U.S.C. § 3553(b), and the Guidelines specifically mandate that departures be the exception and occur only when truly justified. *See* Guidelines Ch. 1, Pt. A, Intro. ¶ 4(b). Given this, we find that the Ninth Circuit's approach offers too broad an interpretation of the aberrant behavior rationale.

In *Carey*, we cited *United States v. Russell*, 870 F.2d 18 (1st Cir.1989), as a good example of a scenario in which the aberrant behavior exception might properly ap-

ply. The defendant in *Russell* drove a Wells Fargo armored truck and had no previous criminal record. A bank mistakenly handed Russell's partner, the truck's messenger, a money bag containing $80,-000. The men initially kept the money, but one week later admitted their misdeed. Russell returned all the money and cooperated fully in the investigation of the crime. Although the First Circuit upheld the district court's decision not to depart downward it noted that Russell's behavior was "arguably 'aberrant.'" *Id.* at 20. In *Carey*, we agreed with this assessment, noting that Russell had committed a single, unplanned, spontaneous act, and had returned the money shortly after committing the offense. *Carey*, 895 F.2d at 325.

In granting Andruska's downward departure, the district court apparently based its decision largely upon the testimony of her husband, who said at the sentencing hearing that his wife "wasn't herself" during the relevant period. Sentencing Tr. at 64. Anthony Andruska stated that "Ella had her own apartment and she had a job on a car lot and she was educated and knew what she was doing," *id.* at 63, but that he didn't "think she knew who she was. We were not getting along, and with the job she had, you know, being there on the car lot all the time, it just—She just wasn't used to it. Kind of got the big head from making good money, too." *Id.* at 64. After explicitly stating that it found his testimony credible, the district court continued,

> I find from what little I have seen on this subject that he is a fine man. He has indicated … that your conduct over this five to six month period, whatever the length may have been, during your relationship with Mr. Taylor, was unusual, that you have never engaged in this type of conduct before and haven't since, that he attributes it in part to perhaps getting a big head as a result of your earnings. But in any event, what he has described in his testimony, I think, can be summed up by saying that he is telling me that your behavior was abberant [sic] and it was unusual, out of the ordinary, for you. I think that is probably correct.

*Id.* at 79. This behavior may well have been aberrant for Andruska, but it was not aberrant in the manner envisioned by our decision in *Carey* or by the Commission in drafting the Guidelines. Perhaps in isolation, Andruska's act of fleeing when the police attempted to pull her car over could be viewed as aberrant. When viewed in context, however, it cannot. Her continued involvement with Taylor after learning of his fugitive status, her efforts to help him evade the authorities, her refusal to acknowledge that she had engaged in wrongful conduct, and the repeated nature of her actions, in no way constitutes "aberrant behavior."

Were we to allow Andruska to escape a heavier sentence on this ground, the exception surely would swallow the general rule of adherence to the Guidelines' presumptive range. We cannot countenance a procedure by which judges, dissatisfied with the strictures of the Guidelines in a given case (perhaps, at times, justifiably so), can fashion sentences they deem more appropriate through an overly expansive interpretation of "aberrant behavior." Whatever one's view of the sentencing consistency achieved by the Guidelines—*see, e.g.*, Gerald Heaney, *The Reality of Guidelines Sentencing: No End to Disparity*, 28 Am. Crim.L.Rev. 161 (1991)—the Guidelines seek to end disparity, *see* 28 U.S.C. § 991(b)(1)(B), and that goal would be undermined if the presumptive ranges could too easily be circumvented.

Although we understand the district court may have been concerned in the present case over a sentence it perceived as unduly harsh, it is our function to apply, rather than recreate, the Guidelines. We conclude that the district court incorrectly characterized Andruska's behavior as "aberrant."

\* \* \*

For the reasons discussed above, the sentence imposed is vacated and remanded for resentencing in accordance with this opinion.

WILL, Senior District Judge, concurring.

While I concur in the court's conclusions, I am impelled to write separately to emphasize that the irrationality and draconian

nature of the Guidelines sentencing process is again unhappily reflected in this case, resulting in what the district court and, I believe, my colleagues understandably recognize to be a harsh sentence. The district judge sentenced Andruska to 42 months imprisonment, hardly a slap on the wrist. The Guidelines calculation is 97–121 months although the statutory maximum specified in 18 U.S.C. § 1071 under which she was convicted is 60 months. Unfortunately, under the Guidelines, neither the district judge nor we appear to have discretion to impose a reasonable sentence. The serious defects and injustice in the Guidelines sentencing process have been noted by a number of courts, most comprehensively in the concurring opinion of Judge Edwards in *United States v. Harrington*, 947 F.2d 956, 963–70 (D.C.Cir.1991). I join in the disposition here, unhappy though I believe it to be, because Congress and the Sentencing Commission have foreclosed a more just result.