UNITED STATES of America, Plaintiff–Appellee/Cross–Appellant,

v.

Adolph BRADLEY, Defendant–Appellant/Cross–Appellee.

Nos. 99–1783, 99–2108.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1999.

Decided Nov. 4, 1999.

---

Hal Goldsmith (argued), Office of the Attorney General, Criminal Division, Fairview Heights, IL, for United States.

Lawrence J. Fleming (argued), Office of the Federal Public Defender, East St. Louis, IL, for Adolph Bradley.

Before POSNER, Chief Judge, and BAUER and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

A jury convicted former police officer Adolph Bradley ("Bradley") on one count of willfully depriving a person of constitutional rights under color of law in violation of 18 U.S.C. § 242. After a sentencing hearing, the district court granted Bradley's motion for a downward departure and sentenced Bradley to three years proba-

tion, 300 hours of community service, and restitution. Bradley now appeals his conviction and the government appeals the downward departure. For the following reasons, we affirm Bradley's conviction, vacate Bradley's sentence, and remand the case for resentencing.

## I. BACKGROUND

The facts of this case read like something out of a "Dirty Harry" movie. In this case, Bradley played the role of Dirty Harry—out to clean up the streets of Brooklyn—Brooklyn, Illinois, that is. Bradley is a 72 year old man who has spent more than forty years of his life working as a law enforcement officer in small towns throughout southern Illinois. His lengthy career as a police officer even included a stint as the Chief of Police in Brooklyn, Illinois, the town which provides the setting for this case. Up until the events that led to Bradley's criminal prosecution and conviction, Bradley had enjoyed a good reputation as a police officer and had strong ties with members of the communities in which he worked.

On June 30, 1998, Bradley was a police officer with the Brooklyn, Illinois Police Department and began working the 11:00 p.m. to 7:00 a.m. shift with his partner, officer Khalid Ashkar ("Ashkar"). That night, Bradley and Ashkar were patrolling the streets of Brooklyn in an unmarked black Chevrolet Caprice that had police emergency lights on the inside front and rear dashboards of the car, but otherwise resembled a civilian car. This car ordinarily served as the Deputy Chief's personal vehicle and was not typically used for road patrol; however, because the Brooklyn Police Department's marked police cars were in disrepair, Bradley and Ashkar were assigned to the Deputy Chief's automobile. Ashkar was driving the unmarked police car. Bradley was armed with a six-inch Smith & Wesson .357 magnum revolver loaded with hollow point bullets.

On the morning of July 1, 1998 at about 5:30 a.m., a 60 year old resident of southern Illinois named Roosevelt Marshall ("Marshall") was driving his 1984 Dodge Aries station wagon from his home in Lovejoy, Illinois to his job at the Cahokia, Illinois School District. While on patrol, Bradley and Ashkar observed Marshall's station wagon roll through a stop sign and decided to stop the station wagon for this traffic violation. Ashkar and Bradley began following the station wagon and activated the red emergency light on the front dashboard of their unmarked car. Marshall continued driving at a speed of about 25 miles per hour and did not stop. Later Marshall said he did not recognize the unmarked vehicle following him as a police car. Neither Bradley nor Ashkar could see who was driving the station wagon they were pursuing.

As Ashkar drove the unmarked police car within twelve feet of the station wagon, Bradley suddenly drew his .357 revolver, leaned out the window of the moving patrol car, and fired one shot. Although Ashkar testified that he could not see in what direction Bradley fired, Bradley claimed that he merely fired a warning shot into the air and did not take aim at the station wagon. Marshall, still driving in what had now become a low-speed chase, heard the gunshot but did not stop. Seconds later, Bradley again leaned out the window with his .357 in hand and this time took aim at the driver of the station wagon. With his second shot, Bradley blasted a hollow point bullet through the rear tailgate of Marshall's station wagon; the bullet then passed through some shoeshine equipment in the rear of Marshall's car and pierced the cushion and steel plate of the rear passenger seat. The bullet penetrated the padding in the back of the driver's seat where Marshall was seated and became embedded in a steel plate directly in line with Marshall's back. Marshall felt a shock in his back. After hearing the second shot and feeling the blow to his back, Marshall pulled over his car because he believed correctly that the people

in the car with the emergency lights were shooting at him.

Bradley got out of the police car with his .357 drawn and ordered Marshall out of the station wagon by shouting, "get out of this car mother fucker before I blow your God damned brains out!" When Marshall emerged from the vehicle, Bradley and Marshall recognized each other, as they had been boyhood friends. Bradley told Marshall that he had run a stop sign and asked Marshall why he did not stop when he saw the police lights. After a brief exchange, Bradley let Marshall leave and did not issue Marshall a traffic citation.

Bradley and Ashkar returned to the Brooklyn police station later that morning. Despite a department policy requiring police officers to immediately report the discharge of their firearm, Bradley left the station without reporting the shooting incident. Ashkar reported the shooting to his supervisors both orally and in writing before he left the police station that morning. Bradley did not mention the shooting until he was questioned about it by the Brooklyn Chief of Police when Bradley returned to work that night at 11:00 p.m.

After the shooting, Marshall went to the FBI office in Fairview Heights, Illinois and reported the incident. An agent from the FBI interviewed Marshall, inspected his station wagon, and recovered the bullet from the steel plate in the driver's seat. The FBI conducted a further investigation by interviewing Ashkar and Bradley. Based on the information collected by the FBI, Bradley was indicted on one count of willfully depriving a person of constitutional rights under color of law in violation of 18 U.S.C. § 242. The indictment charged that Bradley intentionally deprived Marshall of his Fourth Amendment right to be free from the use of unreasonable force during an arrest.

After a three-day trial at which Bradley testified in his own defense, the jury found Bradley guilty as charged in the one-count indictment. After a sentencing hearing, the trial judge granted Bradley's motion for a downward departure, finding that Bradley's conduct constituted a single act of aberrant behavior that warranted a downward departure under 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0. After finding the basis for the departure, Judge Riley departed 18 offense levels downward and sentenced Bradley to three years probation, 300 hours of community service, and restitution. Bradley appeals his conviction and the government appeals the downward departure.

## II. ANALYSIS

### A. Bradley's Appeal of his Conviction

 Bradley first argues that there was insufficient evidence to find him guilty beyond a reasonable doubt. Challenging the sufficiency of the evidence supporting a conviction is a daunting task and the defendant bears a heavy burden. *United States v. McCaffrey*, 181 F.3d 854, 856 (7th Cir.1999); *United States v. Szarwark*, 168 F.3d 993, 995 (7th Cir.1999). We will reverse only when, viewing the evidence in the light most favorable to the government, there is no basis for a rational factfinder to find all of the essential elements of a crime beyond a reasonable doubt. *United States v. Menting*, 166 F.3d 923, 928 (7th Cir.1999).

Bradley was convicted of violating 18 U.S.C. § 242, the relevant portions of which provide:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ... shall be fined under this title or imprisoned not more than one year, or both; and ... if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both....

18 U.S.C. § 242. Section 242 makes it criminal to (1) willfully and (2) under color of law (3) deprive a person of rights protected by the Constitution or laws of the United States. *United States v. Lanier*, 520 U.S. 259, 264, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *see also Screws v. United States*, 325 U.S. 91, 107–08, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *United States v. Senak*, 477 F.2d 304, 306 (7th Cir.1973). In this case, the jury found that Bradley willfully violated Marshall's Fourth Amendment right to be free from excessive force during an arrest under color of law.

■ The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. CONST., amend. IV. This guarantee has long been understood to protect against unreasonable seizures of the person, *Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), which includes a prohibition against the use of excessive force when effecting an arrest. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). To show that a person's right to be free from excessive force during an arrest has been violated, there must be (1) a "seizure" as the Fourth Amendment defines that term; and (2) the seizure, if one occurred, must have been unreasonable under the circumstances. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir.1994) (citing *Donovan v. City of Milwaukee*, 17 F.3d 944, 948 (7th Cir. 1994)).

Bradley insists that the evidence did not support the jury's finding that he violated Marshall's civil rights because there was no "seizure" within the meaning of the Fourth Amendment when he shot Marshall's car. Bradley emphasizes that he shot Marshall's station wagon while Marshall was still driving the car. Bradley argues that there was no seizure because Marshall had not yet stopped the car when Bradley shot the station wagon. Bradley therefore asserts that the gunshot constituted pre-seizure conduct that does not trigger Fourth Amendment protection. We find Bradley's argument unpersuasive.

■ "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen.'" *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. 1865 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). It is, however, difficult to ascertain the precise moment a seizure occurs when law enforcement officers are pursuing an individual who is evading capture by driving or running away from police after a display of authority. *See United States v. Johnstone*, 107 F.3d 200, 206 (3d Cir.1997) ("a 'seizure' can be a process, a kind of continuum, and is not necessarily a discrete moment of initial restraint."). The Supreme Court confronted this problem in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) where a suspected drug dealer ran away from police after he saw police drive by in an unmarked police car. *Id.* at 623, 111 S.Ct. 1547. As the suspect fled, he became cornered between a police officer chasing him on foot and another officer driving the police car. *Id.* After the suspect realized that he was trapped between the two officers, but before the police had physically apprehended him, the suspect threw some crack cocaine to the ground. *Id.* Seconds later, the police officer on foot tackled the suspect, handcuffed him, and arrested him. *Id.* The suspect moved to suppress the crack cocaine evidence on the ground that it was obtained during a seizure that violated the Fourth Amendment. *Id.* The suspect argued that the police "seized" him when they cornered him and he had no place else to run; since he was unreasonably seized when he threw the crack cocaine away, the suspect asserted that the drugs had to be suppressed. *Id.*

The Supreme Court rejected the suspect's argument and held that he had not been seized when he discarded the drugs because he had not yet yielded to the pursuing police. *Id.* at 626, 111 S.Ct. 1547. In reaching this conclusion, the Court reasoned that for a fleeing suspect to be seized for Fourth Amendment purposes, (1) the arresting officer must apply physical force or display a show of authority, and (2) the physical force or show of authority must cause the fleeing subject to stop. *Id.* at 628–29, 111 S.Ct. 1547. Since the suspect in *Hodari D.* was trying to evade capture until the moment police tackled him, the Court ruled that the suspect had not been seized when the police officers trapped him because their show of authority did not make the suspect stop. *Id.* Rather, the suspect's flight from the police only ended when one of the officers tackled him. *Id.*

The Supreme Court also addressed the issue of when a fleeing suspect is seized for Fourth Amendment purposes in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). In *Brower*, police were chasing a suspect that was driving a stolen car. *Id.* at 594, 109 S.Ct. 1378. During the 20 mile chase, police placed an 18–wheel–tractor–trailer across both lanes of the highway in the path of the suspect's flight. *Id.* After the suspect smashed the stolen car into the roadblock and died, his heirs brought a § 1983 claim alleging that the police violated the suspect's Fourth Amendment rights by using excessive force in setting up an unnecessarily dangerous roadblock. *Id.* Finding that the roadblock did not constitute a Fourth Amendment "seizure," the trial and appellate courts dismissed the § 1983 claim for failure to state a claim upon which relief could be granted. *Id.*

The Supreme Court reversed the lower courts' decisions and held that the roadblock could be a seizure that triggered Fourth Amendment protections. *Id.* at 598–99, 109 S.Ct. 1378. In doing so, the Court focused its analysis on the relationship between the force applied and the result of that force. The Court specifically observed that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." *Id.* at 597, 109 S.Ct. 1378. In other words, to effect a seizure, "a person [must] be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599, 109 S.Ct. 1378. Based on these principles, the Court concluded that because the police had placed the roadblock in the highway to stop the fleeing car thief, and the roadblock did in fact cause the suspect to stop, the roadblock could constitute a seizure under the Fourth Amendment. *Id.*

■ *Hodari D.* and *Brower* illustrate that a Fourth Amendment seizure of a fleeing suspect is not, as Bradley argues, an isolated moment that suddenly occurs the instant a suspect stops attempting to evade police. Rather, these cases demonstrate that a seizure is the sum of two parts. First, there must be either a show of authority or a use of force; and second, the show of authority or use of force must have caused the fleeing individual to stop attempting to escape. If these two elements are both present, a seizure has been effected. With this in mind, it becomes abundantly clear that Bradley's gunshot into Marshall's station wagon constituted a seizure under the Fourth Amendment. Here, Bradley and Ashkar pursued Marshall with the emergency light on the front dashboard of their unmarked police car flashing. Bradley fired one gunshot into the air, which Marshall heard. Bradley then fired another shot into the station wagon, which Marshall felt. As soon as Marshall realized that his car had been shot, he stopped because he believed that the people in the car with the emergency light were shooting at him. In short, Bradley applied physical force and a show of authority which caused the fleeing Marshall to stop his car. *See Hodari D.*, 499 U.S. at 628–29, 111 S.Ct. 1547. The evi-

dence fully supported the jury's finding that Bradley's conduct violated Marshall's constitutional rights as charged.

■■■ Bradley next contends that the evidence did not support the jury's finding that he acted "willfully" because he acted out of fear for his own safety rather than a specific intent to deprive Marshall of his constitutional rights. To show a willful deprivation of a civil right under § 242, the government must establish that the defendant acted "in open defiance or in reckless disregard of a constitutional requirement." *Screws v. United States*, 325 U.S. 91, 105, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). A defendant need not "have been thinking in constitutional terms" to willfully violate a constitutional right. *Id.* at 106, 65 S.Ct. 1031. Willfulness may be shown by circumstantial evidence so long as the purpose may "be reasonably inferred from all the circumstances attendant on the act." *Screws*, 325 U.S. at 106, 65 S.Ct. 1031.

We find that the evidence supports the jury's conclusion that Bradley acted willfully. Bradley and Ashkar were chasing Marshall with a police emergency light flashing and Marshall refused to stop. In an effort to bring the chase to a halt, Bradley leaned out the window of a moving police car and fired a bullet into Marshall's station wagon. Although Bradley claims that he believed Marshall may have been reaching for a gun, Ashkar contradicted this statement and testified that he observed no furtive gestures from the station wagon's driver. Neither Bradley nor Ashkar ever saw the driver of the station wagon brandish a weapon of any kind or do anything that could be reasonably perceived as life-threatening. Nevertheless, in an attempt to stop the station wagon's flight, Bradley used deadly force by firing a gunshot into the station wagon that would have hit (and possibly killed) Marshall had it not been for the steel plate in the seat of Marshall's car. Bradley's actions in these circumstances were clearly unreasonable and excessive. The jury had ample evidence to reasonably conclude

that Bradley willfully violated Marshall's Fourth Amendment right to be free from the use of excessive force during an arrest.

■■■ Bradley's final attack on his conviction focuses on the trial court's jury instructions. We review jury instructions as a whole to determine whether they provide a fair and accurate summary of the law. *United States v. Tingle*, 183 F.3d 719, 729 (7th Cir.1999). Bradley's complaint about the jury instructions relates to the "willfulness" requirement of a § 242 violation. Bradley argues that the district court erred by failing to give an instruction he proposed that defined the term "willfully." Bradley's proposed definition of the willfulness element stated:

> The word "willfully" as used in the indictment and these instructions means deliberately and intentionally, as distinguished from something which is merely careless, inadvertent or negligent, that is to say the Defendant must have known that his acts would deprive Mr. Marshall of his constitutional rights and must have specifically intended that Mr. Marshall be deprived of such rights.

The trial judge refused to give this proposed instruction, and instead gave the following instructions which commented on the intent requirement of a § 242 violation:

> The government must prove that the defendant acted with the intent that Roosevelt Marshall be deprived of his right not to be deprived of liberty without due process of law, which includes the right to be secure in his person and free from the use of unreasonable force by one acting under the color of law. The defendant need not have known that these rights were secured by the Constitution or the laws of the United States.

> One factor which you may consider in your determination of whether the defendant had the requisite specific intent to deprive the victim of a right is the nature and degree of force used by the defendant.... If the force used by defendant was greater than the force that

would appear reasonably necessary to an ordinary, reasonable and prudent law enforcement officer, you may consider that excessive force as evidence that the defendant acted with the requisite specific intent, that is, that he specifically intended to do that which the law forbids.

The issue in this case is whether Adolph Bradley willfully violated Mr. Marshall's rights under the United States Constitution. Conduct by a police officer that violates some state law or police department regulation is not necessarily a violation of the federal Constitution or laws of the United States. In order to find Adolph Bradley guilty of the offense charged in the indictment, you must find beyond a reasonable doubt that his actions violated Mr. Marshall's rights under the United States Constitution and that Adolph Bradley intended to violate those constitutional rights.

In order to find the Defendant Adolph Bradley guilty of the offense charged in the indictment, you must find that he acted "willfully" to deprive Mr. Marshall of his constitutional right not to be deprived of liberty without due process of law.

■ When read as a whole, we cannot say that these jury instructions failed to provide a fair and accurate summary of the willfulness element of a § 242 violation or that they could have clouded the jury's comprehension of the issue to such an extent that it prejudiced Bradley. Willfulness under § 242 essentially requires that the defendant intend to commit the unconstitutional act without necessarily intending to do that act for the specific purpose of depriving another of a constitutional right. In other words, to act "willfully" in the § 242 sense, the defendant must intend to commit an act that results in the deprivation of an established constitutional right as a reasonable person would have understood that right. *See United States v. Dise*, 763 F.2d 586, 592 (3d Cir.1985) ("although a defendant may not have ex-

pressed an intention to violate the Constitution, and indeed may not have recognized that his acts violate the Constitution, he may be found to have willfully violated federal rights if he acted in reckless disregard of the law.").

Here, the jury instructions fairly and accurately conveyed the intent requirement of § 242. Those instructions told the jury that the government had to prove that Bradley "acted with the intent that Roosevelt Marshall be deprived of his right not to be deprived" of a constitutional right. The judge also instructed to find Bradley guilty he must have "acted with the requisite specific intent, that is, that he specifically intended to do that which the law forbids." Finally, Judge Riley informed the jurors that "[i]n order to find Adolph Bradley guilty ∙ of the offense charged in the indictment, you must find beyond a reasonable doubt that his actions violated Mr. Marshall's rights under the United States Constitution and that Adolph Bradley intended to violate those constitutional rights." Because these instructions concerning Bradley's intent expressed the essence of § 242's willfulness requirement, we find no error in the jury instructions.

■ Bradley argues that the instructions were confusing because they did not specifically define the term "willfully." Bradley bases this argument on the fact that the statute only uses the term "willfully" to describe the intent requirement of a § 242 violation. Bradley then points out that the Committee on Federal Jury Instructions of the Seventh Circuit has recommended that "an instruction defining the word 'willfully' not be given unless the word is in the statute defining the offense being tried." *Seventh Circuit Federal Criminal Jury Instructions* § 4.09 at 67 (West 1999). We recognize this recommendation, but note that the Committee also observed that "[i]n many cases, the court need not define 'willful' because the concept of willfulness will be adequately explained in other instructions defining

'knowingly,' 'intentionally,' or 'deliberately.'" *Id.* As we have explained, the district court's failure to define the term willfully was not improper because the other instructions sufficiently articulated the intent requirement of § 242.

## B. The Government's Appeal of the Downward Departure

■ The government challenges the district court's decision to grant Bradley a downward departure. Specifically, the government argues that (1) Bradley's conduct did not constitute aberrant behavior; (2) the trial court failed to make adequate factual findings to support the downward departure; and (3) the extent of the departure granted was excessive and unsupported by the district court's findings. We agree with the government's position that the trial judge failed to make adequate factual findings to support the downward departure.

■ Whenever we review a district court's decision to grant a downward departure, our first order of business is to verify "whether the district court has stated adequate grounds for departure. This is a question of law and is reviewed *de novo*." *United States v. Hendrickson*, 22 F.3d 170, 175 (7th Cir.1994). "In order to support a downward departure, the district court is required to make 'particularized findings,' for without them, we cannot fulfill our proper function as an appellate tribunal and determine whether the departure was 'reasonable.'" *United States v. Sherman*, 53 F.3d 782, 785–86 (7th Cir. 1995) (quoting *United States v. Carey*, 895 F.2d 318, 324 (7th Cir.1990)). In this case, our threshold analysis reveals that the trial court did not make adequate factual findings to support the downward departure.

At the sentencing hearing, the district court merely gave a capsule summary of each of several letters received on Bradley's behalf. Generally speaking, those letters all came from people that have known Bradley for many years and stated that Bradley is an upstanding and well-respected member of the community. Judge Riley also referenced a letter from a psychologist that had interviewed Bradley and concluded that Bradley was suffering from acute stress disorder when he fired the shots at Marshall's station wagon. After reviewing these letters, and a letter from Marshall about the effects the shooting incident have had on him, the district court summarily concluded:

> it is the judgment of this court that the court will downwardly depart from the level contained in the presentence investigation to a level 8. The reason for the downward departure is that the court believes that in looking at the 40 plus years of service [Bradley has] given to the community, that this was indeed an aberrant occurrence. Yes, there are things that we can say were not aberrant about it, but I believe that on overall balance, this was an aberrant happening.

■ In short, the district court's statements on the record do not give us a sufficient basis upon which to review the downward departure. We have previously recognized that if a criminal act constitutes a single instance of aberrant behavior, a defendant may receive a downward departure under the United States Sentencing Guidelines. *See United States v. Partee*, 31 F.3d 529, 533 (7th Cir.1994); *United States v. Andruska*, 964 F.2d 640, 646 (7th Cir.1992); *United States v. Carey*, 895 F.2d 318, 325 (7th Cir.1990). For conduct to qualify as "aberrant behavior," it must be "more than merely something 'out of character' or the defendant's first offense." *Carey*, 895 F.2d at 325. Rather, the criminal conduct must be something in the nature of a spontaneous, sudden, or unplanned act. *Partee*, 31 F.3d at 534; *Andruska*, 964 F.2d at 646. However, the district court's stated reasons for granting the downward departure because of aberrant behavior address none of these pertinent considerations. We therefore vacate

Bradley's sentence and remand this case for resentencing.

## III. CONCLUSION

For the foregoing reasons, we affirm Bradley's conviction, vacate his sentence, and remand this case for resentencing consistent with this opinion.