In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-2565 & 00-3026

United States of America,

Plaintiff-Appellee,

v.

David Brown and Bruce Troxel,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 99 CR 61--James T. Moody, Judge.

Argued January 18, 2001--Decided May 16, 2001

   Before Bauer, Manion, and Diane P. Wood,
Circuit Judges.

   Bauer, Circuit Judge.  David Brown and
Bruce Troxel, Gary, Indiana police
officers, were convicted of depriving an
individual of his constitutional rights
under color of law in violation of 18
U.S.C. sec. 242 and of using a firearm in
a crime of violence in violation of 18
U.S.C. sec. 924 (c). Defendants ask us to
reverse their convictions because: (1)
the district court improperly admitted
other occurrence evidence stemming from
an altercation between Brown and a nude
dancer, Jill Carda ("the Carda
incident"); and (2) the district court
improperly instructed the jury. We
decline this invitation.

I.  Background

   On July 14, 1998 around 9:00 PM, Tab
Wilhoit delivered a load of steel to D&W
Transfer. He parked in D&W's lot and
decided to take a nap. Wilhoit lowered
the landing gear on the trailer and
locked his cab to the trailer. In that
position, Wilhoit could not move his cab.
Unbeknownst to Wilhoit, drug deals were
common in the parking lot. Wilhoit fell
asleep with his window partially down. He
awoke at 2:00 AM to find a man sticking
his head through the window and asking
for money. Wilhoit gave the man a few

dollars and told him to leave. Wilhoit got out his pocket knife to defend himself in case the man returned and prepared to move his cab.

Next door, off-duty police officers Brown and Troxel whiled away the night of July 14 socializing and drinking at the Caddy Shack Lounge ("Lounge"), a strip club and bar. Although Brown moonlighted at the Lounge as a bouncer, he was not working that night or early the next morning. Around 2:00 AM, Brown and Troxel heard that a man was dealing drugs in the D&W lot and went to investigate. They encountered a man on a bicycle who admitted that he was selling drugs, pointed out Wilhoit's cab, and told the officers that he got a few dollars from the man in it.

As Brown and Troxel approached Wilhoit's cab, Wilhoit turned his lights on. Troxel approached the passenger's side of Wilhoit's cab, demanded that Wilhoit open the "mother- fucking door right now" and held his police badge up to the window. Troxel was not wearing a police uniform. Wilhoit refused to open the door because, he said, he thought Troxel was going to rob him. Wilhoit did not believe Troxel was a police officer because Troxel was dressed in plain clothes and there was no police cruiser in the immediate vicinity. Troxel went to the driver's side window, which was rolled down 6 to 8 inches. Troxel put his badge through the driver's window, demanding that Wilhoit exit his cab. When Wilhoit refused, Troxel reached inside the cab; with one hand he choked Wilhoit by twisting his thick gold necklace tightly around his neck. With the other hand, Troxel grabbed Wilhoit's hair and attempted to pull him out the window. Terrified, Wilhoit stabbed Troxel in the arm 5 to 6 times with his pocket knife.

Seeing Troxel's injuries, Brown, dressed in a police jumpsuit, approached both the passenger and driver's side of the cab demanding that Wilhoit exit the truck. Wilhoit continued to refuse. Brown leapt onto the hood of the cab and identified himself as a police officer, showing Wilhoit the word "POLICE" on his back. Despite Brown's demands, Wilhoit steadfastly remained in the cab. Brown pulled his gun and pointed it at Wilhoit. Convinced he was being robbed, Wilhoit

yelled into his CB radio for someone to call the police. Brown responded, "I am the fucking police! Unlock the door!" and kicked the windshield repeatedly. Wilhoit finally opened his cab door.

According to Wilhoit, Troxel struck him in the face with a hard object, and both defendants repeatedly punched and kicked Wilhoit. Wilhoit attempted to defend himself, but Brown threw him to the ground. The defendants put a gun to Wilhoit's head and threatened that if he told anyone of the incident, they would kill him and his family. They told Wilhoit that they should "kill him now" and throw his body out back in the transfer lot. Defendants took Wilhoit's wallet and asked him where he lived. Wilhoit answered truthfully, but his driver's license reflected a previous address. Defendants accused Wilhoit of lying, smashed the side of his truck with a hammer, and reiterated that they would kill him if he told anyone of the altercation.

After defendants left, Wilhoit found Troxel's wallet lying on the ground. He took it, rolled up the truck's landing gear, and drove to the first truck stop in Michigan where he called the Michigan state police. The Michigan police found an upset Wilhoit bleeding from his face and wearing a ripped shirt. Wilhoit turned over Troxel's wallet, and the Michigan police investigated. The investigation disclosed that Brown and Troxel failed to report the incident to the Gary police department, which the department required officers to do when they used force against civilians or were themselves injured.

Defendants were charged with violating 18 U.S.C. sec. 924(c)(1) & (2) for knowingly using and carrying a firearm in the commission of a violent crime, and 18 U.S.C. sec. 242 for depriving Wilhoit of his constitutional right to be free from intentional use of unreasonable and excessive force by one acting under color of law. The latter claim is grounded in the Fourth Amendment right to be free of unreasonable searches and seizures.

The Carda incident occurred roughly one year prior to the altercation with Wilhoit. While Brown was working as a bouncer at the Lounge, he pulled a chair

out from under an exotic dancer, Jill Carda, as she tried to sit down. Carda confronted Brown. Brown threw Carda into a wall and then face down onto the ground. He choked her by stepping on the back of her neck and pulling her arm backward until it cut off her breath. Brown asked the Lounge owner whether he should "take Carda out back and finish her off."

The government planned to use the Carda incident to prove the intent element of sec. 242. Before trial, defendants submitted a motion in limine to exclude this incident, theorizing that under Fed. R. Evid. 404(b), it would constitute an inadmissible prior bad act. After initially granting the motion in limine, the court reversed course and ruled the Carda incident admissible.

The jury convicted defendants on both counts. Brown and Troxel now contest their convictions, arguing that the Carda incident should have been excluded from evidence as a prior bad act under Fed. R. Evid. 404(b) and that flaws in jury instruction No. 21, given over the defendants' objection, denied them a fair trial.

II.  Discussion

A.  The Carda Incident

Defendants argued both before the district court and on appeal that the Carda incident is an inadmissible prior bad act under 404(b). We review the court's decision to admit evidence under sec. 404(b) for abuse of discretion. See United States v. Williams, 216 F.3d 611, 614 (7th Cir. 2000). The district court admitted the Carda incident based in part on its judgment that the incident was probative of the intent element of 18 U.S.C. sec. 242, which makes it a crime to (1) wilfully (2) under color of law (3) deprive a person of rights protected by the Constitution of the laws of the United States, see United States v. Bradley, 196 F.3d 762, 767 (7th Cir. 1999) (citations omitted). Evidence of prior bad acts is properly admitted under 404(b) if the evidence: (1) tends to establish a matter at issue other than the defendant's propensity to commit the crime charged; (2) is sufficiently similar and close in time to the matter

at issue to be relevant; (3) supports a jury finding that the defendant committed the similar act; and (4) has probative value that substantially outweighs the danger of unfair prejudice. See Williams, 216 F.3d at 614.

Defendants dispute the first element of the 404(b) test, that the Carda incident sheds light on a matter at issue, because they argue that defendants' intent was not at issue. Intent is automatically at issue in specific intent crimes. See United States v. Gellene, 182 F.3d 578, 595 (7th Cir. 1999). Contrary to defendants' argument, sec. 242 is a specific intent crime. See Screws v. United States, 325 U.S. 91, 103 (1944) ("But as we have seen, the word 'wilfully' was added to make [sec. 242] 'less severe.' We think the inference is permissible that its severity was to be lessened by making it applicable only where the requisite bad purpose was present, thus requiring specific intent not only where discrimination is claimed, but in other situations as well."); Bradley, 196 F.3d at 769-70 (upholding jury instructions which required specific intent as correctly summarizing the "wilfulness" element of 18 U.S.C. sec. 242); United States v. Johnstone, 107 F.3d 200, 207-09 (3d Cir. 1997) (exploring the role of specific intent in 18 U.S.C. sec. 242); United States v. Reese, 2 F.3d 870, 880-82 (9th Cir. 1993) (discussing the specific intent requirement in 18 U.S.C. sec. 242). Defendants further argue that the Carda incident is unnecessary to prove intent because they did not contest the element. However, intent is a material issue in this case, and, subject to some restrictions not relevant here, the prosecution is entitled to establish it by using admissible evidence of their choosing. See United States v. Williams, 238 F.3d 871, 875 (7th Cir. 2001).

Defendants' most serious challenge to the Carda incident contends that it is not similar enough to the Wilhoit altercation to be probative of defendants' intent to deprive Wilhoit of his rights. Rather, they argue that it impermissibly speaks to Brown's propensity for violent behavior. See Fed. R. Evid. 404(b). The admissibility of the Carda incident presents a close case. Whether a prior bad act is similar enough

to speak to an issue that 404(b) deems legitimate is case specific and depends on the theory employed by the party lobbying for admission. See United States v. Torres, 977 F.2d 321, 326 (7th Cir. 1992).

The government urges that the Carda incident is probative of Brown's intent to use his police affiliation to effectuate disproportionate and violent punishment against people who failed to respect his authority. Defendants argue that the Carda incident is not probative because Brown was not acting under color of law when the incident occurred; specifically, Brown was not wearing any police gear. When he worked at the Lounge, however, Brown drew attention to his police authority. He insured the Lounge patrons' awareness of his affiliation by regularly wearing his police uniform and jumpsuit to his job as a bouncer. Brown's general emphasis of his police affiliation diminishes the importance of the fact that Brown was not wearing any police uniform on the day of the Carda incident. When Brown was working as a bouncer, Carda disrespected his authority by swearing at him and challenging him for pulling her chair away. Brown responded by violently punishing Carda for her insolence. He slammed Carda to the ground, choked her, and threatened to "finish her off." Similarly, Wilhoit defied Brown by ignoring his command to exit the truck. Brown retaliated by damaging Wilhoit's truck, beating Wilhoit to the ground, and threatening to kill him. Given the government's theory that Brown intended to punish people who defied his authority, we believe that the Carda incident is probative of Brown's retaliatory intent to use excessive force whenever his orders are ignored or his authority questioned. The Carda incident demonstrates more than Brown's general propensity for violence. See, e.g., Torres, 977 F.2d at 326-28.

Defendants last contend that the incident was unfairly prejudicial and encouraged the jury to decide the issue of guilt based on Brown's past actions. The Carda incident, however, added valuable information about Brown's intent to punish defiant individuals. Further, the judge admonished the jury three times, once immediately before their

deliberations, that they should consider the Carda incident only so far as it spoke to Brown's intent. Given these factors, the district court did not abuse its discretion by admitting the Carda incident.

At any rate, even if the admission into evidence was error, it was harmless beyond a reasonable doubt. Error is rendered harmless when it is clear beyond a reasonable doubt that a rational jury would have convicted defendants absent the erroneously admitted evidence. See United States v. Swan, 224 F.3d 632, 635 (7th Cir. 2000), amended by 230 F.3d 1040 (7th Cir. 2000). Given the other evidence in this case, a rational jury would have found that the defendants intended to deprive Wilhoit of his right to be free from excessive use of force even without evidence of the Carda incident. Wilhoit's injuries and the damage to his truck reflect the disproportionate force the defendants used to compel his compliance. This physical evidence and the fact that Wilhoit was in possession of Troxel's wallet bolsters Wilhoit's version of the events. Most tellingly, Brown and Troxel failed to file a police report about the Wilhoit incident, which the Gary police department requires when an officer injures a civilian in the course of his duties or is injured himself.

B.  Jury Instructions

We review the district court's choice of jury instructions "as a whole to determine whether they provide a fair and accurate summary of the law." Bradley, 196 F.3d at 769. If and when we find the jury instructions inadequate, we will reverse defendants' convictions only if we believe the jury's understanding of the issues to be so misguided that it prejudiced one of the parties. See Soller v. Moore, 84 F.3d 964, 969 (7th Cir. 1996) (citations omitted).

Defendants charge that the jury instruction failed adequately to instruct jurors to use the "objectively reasonable" standard when determining whether defendants used excessive force. Defendants were convicted under 18 U.S.C. sec. 242, which protects against the deprivation by someone acting under color of the law of "any rights, privileges, or

immunities secured or protected by the Constitution or laws of the United States . . . ." In this case, the violation of sec. 242 stems from unreasonable use of force during an investigatory stop, which is prohibited by the Fourth Amendment. The point of view from which the jury must evaluate the unreasonable or excessive use of force claim is therefore dictated by the Fourth Amendment, and has been most recently and clearly articulated by the Supreme Court in the context of a 42 U.S.C. sec. 1983 violation. In unreasonable or excessive use of force cases, jurors must determine whether the use of force was reasonable by using the "objective reasonableness" standard; that is, by evaluating the situation from the viewpoint of "a reasonable officer on the scene." Graham v. Connor, 490 U.S. 386, 388, 395-96 (1988). Defendants argue that instruction No. 21 does not convey that the jurors should evaluate the events from "the perspective of the officers at the time of the unfolding events." However, this argument is rebutted by the very language of the instruction:

If you find that a defendant used force in this incident, you may then consider whether the force used by a defendant was necessary in the first place or was greater than the force that would appear necessary to a reasonable law enforcement officer on the scene (emphasis added).

Instruction No. 21 correctly and adequately summarizes the "objective reasonableness" standard.

Defendants propose alternate jury instructions No. 9 and No. 12, which articulate the "objective reasonableness" standard in different language than instruction No. 21. In particular, instruction No. 12 elaborates on the definition of "reasonableness" using language taken from Graham, 490 U.S. at 396. While these alternate instructions are legally correct, parties are not entitled to their preferred instructions. Instruction No. 21 was adequate and we will not rule that the district court selected it in error.

The defendants further ask us to reverse because the jury instructions failed to address (1) circumstances which justify police use of deadly force and (2)

defendants' failure to follow police procedures. The defense is entitled to instructions on its case theory only if (1) the proffered instruction is a correct statement of the law; (2) the defense theory is supported by evidence; (3) the defense theory is not part of the charge; and (4) failure to give the instruction would deny defendants a fair trial. See United States v. Wilson, 134 F.3d 855, 864 (7th Cir. 1998). Defendants fail to establish that the court's refusal denied them a fair trial. Instruction No. 21 addressed use of force:

A law enforcement officer is justified in the use of any force which he reasonably believes to be necessary to effect an investigatory stop, arrest, or to hold someone in custody and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm.

The district court did not abuse its discretion when it chose not to address the use of deadly force in particular.

Further, any failure to instruct on police procedures did not deny defendants a fair trial. Defendants lobbied to inform the jury that failure to file a police report did not itself constitute a violation of Wilhoit's constitutional rights, however, the government never argued such a theory. Rather, the government contended that the beating violated Wilhoit's rights and pointed to defendants' failure to file a police report as evidence of defendants' intent. Therefore, the district court did not abuse its discretion by refusing to instruct the jury on deadly force and report filing.

We Affirm defendants' convictions.