In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3776

DONNA FLOURNOY,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:09-cv-07159 — **William T. Hart**, *Judge.*

ARGUED MARCH 31, 2016 — DECIDED JULY 21, 2016

Before KANNE and MANION, *Circuit Judges*, and PEPPER, *District Judge.*[*]

MANION, *Circuit Judge*. Donna Flournoy was severely injured by a flashbang grenade deployed by Chicago police during their execution of a search warrant for a suspected drug dealer. Flournoy responded with this lawsuit against

---

[*] Hon. Pamela Pepper, Eastern District of Wisconsin, sitting by designation.

two of the officers involved in the search, alleging that they used excessive force in violation of the Fourth Amendment. The case went to trial and the jury found for the defendants.

Flournoy now seeks a new trial on several grounds. She asserts that the jury's verdict has no reasonable basis in the record; that the district court erroneously excluded a key piece of evidence at trial; and that a signed statement submitted by the jurors with their verdict shows that they disregarded the law in finding for the defendants.

We affirm. The jury's verdict is supported by the record and is not against the manifest weight of the evidence; the district court's evidentiary ruling was not an abuse of discretion; and the jury's statement is consistent with the verdict and does not affect the verdict's validity. Flournoy received a fair trial before a jury of her peers, and is not entitled to a new trial.

## I. BACKGROUND

### A. Search Warrant

In November 2008, Chicago police officer Robert Lobianco learned from an informant that a man named Anthony was selling crack cocaine from a garden apartment located at 1108 N. Lawler Ave. The informant said that he had frequently purchased crack from Anthony at the apartment over the past several months and that Anthony answered the door carrying a handgun during the transactions. Based on this information, Officer Lobianco applied for and obtained a search warrant for the apartment on November 13, 2008. Officer Lobianco did not believe that he could execute the warrant safely, so he requested assistance from the local SWAT team. SWAT team sergeants Wayne Wieberg and Thomas Lamb agreed that the

warrant presented a high degree of risk and approved the request.

**B. SWAT Team's Preparations**

Officer Daniel Colbenson and another SWAT team member then prepared a mission plan for executing the warrant. In doing so, Officer Colbenson relied on an official "High Risk Warrant Services" form signed by Sergeant Wieberg. The form indicated that Anthony might be accompanied by "numerous" other people selling narcotics from the apartment; that he was possibly a convicted felon; and that he was known to protect his drug operation and to answer the door carrying a weapon in his waistband. Officer Colbenson was also aware that the apartment was in a high-crime neighborhood that would require officers to pay special attention to the surrounding area outside the apartment during the search.

In light of these considerations, Officer Colbenson's plan called for a team of approximately twenty officers to effect a "dynamic entry" with the goal of securing the premises within thirty seconds. Some officers were assigned to enter and clear the apartment, others to secure the building's exterior, and others to conduct surveillance from an unmarked van. The plan also authorized the use of "flashbang" grenades as needed. A flashbang is an explosive diversionary device that generates a blinding light and deafening noise to give police a tactical advantage by temporarily disorienting those nearby.

**C. Execution of the Warrant**

The SWAT team executed the warrant on the evening of November 13, 2008. At the time, Flournoy was at the apart-

ment visiting her son "Tony," who was there with his girl-
friend and another of Flournoy's sons. For an hour or two be-
fore the search, two officers specially trained in surveillance
watched the apartment to gather real-time intelligence. The
officers informed Officer Colbenson that the apartment lights
were on, but Officer Colbenson did not receive any infor-
mation about who was in the apartment.

Once the full SWAT team arrived, an officer knocked on
the apartment door and yelled, "Chicago police, search war-
rant!" When no one answered after a number of seconds, the
officers breached the door with a battering ram. Around the
same time, Officer Colbenson used a "break-and-rake" tool to
clear out the windows along the front and side of the apart-
ment.[1] (This was intended to cause a distraction and to enable
the officers to see into the area they were about to enter.) Upon
breaking the side window, Officer Colbenson saw Flournoy
move off an air mattress in the direction of the door that had
been breached. Officer Colbenson testified that he saw
Flournoy only momentarily, "probably a second at the most."
He further testified that he did not know it was Flournoy at
the time, and that, "for all [he] knew, she could have been the
offender."

Meanwhile, Officer Quinn looked through the doorway to
see if it was safe to use a flashbang. Officer Quinn did not see

---

[1] A break-and-rake is a long, hooked pole designed to break windows
and pull curtains out of the way.

anyone inside, so he lightly tossed a flashbang into the apartment's entryway.[2] Unfortunately, the flashbang's blast severely wounded Flournoy's right leg.[3] After the flashbang went off, a group of officers entered through the doorway and quickly secured the apartment. Several officers administered first aid to Flournoy until she was transported to the hospital by ambulance. The SWAT team's search of the apartment uncovered narcotics and a loaded 9 millimeter handgun.

### D. Legal Proceedings

Flournoy subsequently filed a civil action against Officers Quinn and Colbenson under 42 U.S.C. § 1983, alleging that they used excessive force in connection with the November 13, 2008, search. Flournoy further alleged that Officer Colbenson unlawfully failed to intervene to prevent Officer Quinn's use of excessive force.

During discovery, the defendants produced two copies of a typed police report that was co-authored and signed by Officer Colbenson shortly after the search. The report recounts the circumstances of Flournoy's injury and notes that "a Noise Flash Diversionary Device" was deployed in the search. One of the copies also includes a handwritten notation beneath the typed narrative stating, "two flashbangs deployed." The other

---

[2] Specifically, Officer Quinn testified that he gave the flashbang a "slight toss"; it "didn't go up into the air," but "just left [his] waist level and just dropped."

[3] The record contains conflicting evidence regarding Flournoy's precise location at the time of her injury. Officer Colbenson testified that he saw Flournoy move from the mattress just before the flashbang went off, while Flournoy testified that she was sleeping on the mattress when she was injured.

copy does not include this handwriting, and neither copy contains any additional handwritten statements. When questioned about the handwriting at deposition, Officers Quinn and Colbenson both testified that they did not make the notation and did not know who did. They also testified that they were aware of only one flashbang being deployed during the search.[4] Over Flournoy's objection, the district court ultimately excluded the handwritten notation as hearsay and instead admitted a copy of the report without the notation.

Following trial the jury returned a verdict for the defendants on all claims. The jury submitted the following signed statement with its verdict: "While we agree that this was a horrible instance, in our collective opinion, the errors made by the Chicago Police Department as a whole cannot fall on the shoulders of these two defendants." The district court entered final judgment for the defendants and denied Flournoy's motion for a new trial. Flournoy filed this timely appeal.

## II. DISCUSSION

Flournoy raises three arguments on appeal. First, she argues that the verdict must be reversed because no rational jury could conclude that the defendants did not use excessive force when conducting the search that led to her injury. Second, she contends that the district court erred by excluding

---

[4] In contrast, Flournoy's two sons and the remaining occupant of the apartment variously testified to hearing multiple explosive noises during the search. *See, e.g.*, Trial Tr. at 441, 447 (Flournoy's son "Tony" testifying that he heard "two or three" "bangs" that sounded like "little bombs"); 458 (Flournoy's other son testifying that he heard several "bombs" or "boom sounds"); 489–92 (Tony's girlfriend testifying that she saw "maybe like eight" "smoke bombs" get shot through the apartment's windows).

the handwritten statement, "two flashbangs deployed," found on one of the copies of Officer Colbenson's typed police report. Finally, she argues that the note submitted by the jury with its verdict undermines the verdict's validity and requires a new trial. We address each argument in turn.

### A. The jury's verdict is not against the manifest weight of the evidence.

We review the district court's denial of a motion for a new trial for abuse of discretion. *United States v. Whiteagle*, 759 F.3d 734, 756 (7th Cir. 2014). Under this "'extremely deferential'" standard, *Galvan v. Norberg*, 678 F.3d 581, 588 (7th Cir. 2012), a new trial may be granted "only if the jury's verdict is against the manifest weight of the evidence." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006). To meet this standard, Flournoy must demonstrate that "no rational jury" could have rendered a verdict against her. *Id.* We must view the evidence in the light most favorable to the prevailing parties, and will sustain the verdict so long as it is supported by a "'reasonable basis'" in the record. *Id.*

In determining whether police used excessive force under the Fourth Amendment, the relevant inquiry is "whether the officers' actions [were] objectively reasonable in light of the totality of the circumstances." *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. When applying this standard, we are mindful that "police officers are often forced to make

split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Before executing the warrant in this case, the defendants were advised that they would be searching the apartment of a drug dealer who protected his operation and carried a gun, who had been identified as a possible convicted felon, and who might be accompanied by numerous other individuals involved in the drug trade. The suspect's apartment was also known to be in a high-crime area. In light of these potentially dangerous circumstances, a rational jury could conclude that the defendants' challenged actions were objectively reasonable measures designed to ensure officer safety.

To begin, the evidence supports the jury's finding that Officer Colbenson acted reasonably when he cleared the apartment's windows to cause a distraction and enable officers to see inside the area they were about to enter. Flournoy suggests that Officer Colbenson should have told the other officers not to deploy a flashbang once he saw Flournoy inside, but Officer Colbenson testified that he saw Flournoy only momentarily and so had no opportunity to intervene. Officer Colbenson's testimony on this point supports the jury's verdict, and the jury was entitled to believe him. *See King*, 447 F.3d at 534.

The evidence also supports the jury's finding that Officer Quinn did not use excessive force when he deployed the flashbang to facilitate a safe and speedy execution of the warrant. Officer Quinn testified that, in accordance with his training, he first visually scanned the area where the flashbang was to be deployed, and released the flashbang only after determining that the area was clear. Although Officer Quinn might

have seen Flournoy (and the injury might have been avoided) if he had first entered the apartment to conduct a more thorough inspection, he testified that he believed it was dangerous to enter the apartment before deploying the flashbang and that he was specifically trained not to do so. *See* Trial Tr. at 278 (Officer Quinn confirming that he was trained not to enter a room in which he was about to use a flashbang, and explaining that, "[i]f I was to enter the apartment or stick my head in, somebody inside an area where I couldn't see could have shot me"); *see also id.* at 622 (Sergeant Lamb testifying that the officers were trained "never" to step inside a room before deploying a flashbang: "It defeats the purpose of having the flashbang. … So you deploy the flashbang first, then take that advantage and move in once it's deployed.").[5] Again, we decline to supplant the jury's assessment of Officer Quinn's credibility on these critical points.[6]

Viewed in the light most favorable to the defendants, the evidence adequately supports the jury's verdict that Officers Quinn and Colbenson did not use excessive force, and that

---

[5] This court has also previously recognized that the Fourth Amendment does not require police to expose themselves to potential gunfire when inspecting an area where a flashbang is to be deployed. *See Estate of Escobedo v. Martin*, 702 F.3d 388, 408 (7th Cir. 2012) ("There are many situations where a visual inspection of a room prior to deploying a flashbang is impossible or extremely dangerous.").

[6] Flournoy also argues that the jury's verdict should be overturned because the use of a flashbang in conjunction with a knock-and-announce search warrant is excessive force as a matter of law. Flournoy cites no authority in support of this categorical proposition, nor does her argument comport with the Supreme Court's totality-of-the-circumstances approach to determining reasonableness under the Fourth Amendment. We therefore reject this argument without further comment.

Officer Colbenson did not unlawfully fail to intervene. The verdict is not against the manifest weight of the evidence, and the district court did not abuse its discretion in denying Flournoy's motion for a new trial.

**B. The district court properly excluded the handwriting on the police report.**

Flournoy next argues that the district court erroneously excluded the handwritten notation—"two flashbangs deployed"—found on one of the copies of Officer Colbenson's typed police report produced in discovery. She asserts that the exclusion of this evidence deprived her of a fair trial because the number of flashbangs deployed was crucial to the determination of excessive force.

We review the district court's evidentiary rulings for abuse of discretion. *Griffin v. Bell*, 694 F.3d 817, 826 (7th Cir. 2012). Hearsay, or an out-of-court statement offered to prove the truth of the matter asserted, is generally not admissible unless it falls within an exception to the hearsay rule. *United States v. Hawkins*, 803 F.3d 900, 901 (7th Cir. 2015). Flournoy does not dispute that the handwriting on Officer Colbenson's report is hearsay, but argues that it is nonetheless admissible under two exceptions: the business-records exception, Fed. R. Evid. 803(6), and the residual exception, Fed. R. Evid. 807(a).[7]

---

[7] For the first time on appeal, Flournoy argues that the handwriting is also admissible as a public record and as a statement by an opposing party. *See* Fed. R. Evid. 801(d)(2), 803(8). Flournoy has waived these arguments by failing to raise them below. *See Selective Ins. Co. of S.C. v. City of Paris*, 769 F.3d 501, 508 (7th Cir. 2014) ("'It is a well-established rule that arguments not raised to the district court are waived on appeal.'").

Under Federal Rule of Evidence 803(6), the business-records exception applies only if the record was made (1) at or near the time of the event that was recorded, (2) by (or from information transmitted by) someone with knowledge, and (3) in the course of a regularly conducted activity of the organization. Fed. R. Evid. 803(6)(A)–(B). None of these requirements is met here. There is no evidence regarding when the handwriting was made, so there is no indication that it was made at or near the time of the search or in the normal course of business. And since no one knows who wrote it, there is likewise no suggestion that it was written or transmitted by someone with knowledge of the event that it describes.[8]

The residual exception doesn't apply either. That exception applies only when the hearsay statement has adequate circumstantial guarantees of trustworthiness; is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and admitting it would serve the interests of justice. Fed. R. Evid. 807(a). The handwriting here plainly lacks circumstantial guarantees of trustworthiness: there is no indication of who made it, or when and how it was made; it appears on only one of the copies of the report; and it conflicts with the report's official typed narrative (which states only that "a" flashbang was deployed in the search), as well as Officers Quinn and Colbenson's testimony that to the best of their knowledge only one flashbang was deployed. Nor was the notation the most probative evidence available to support Flournoy's theory that more than one flashbang was used: in

---

[8] The business-records exception also does not apply because, as discussed below, the questionable circumstances surrounding the note's origin suggest a lack of trustworthiness. *See* Fed. R. Evid. 803(6)(E).

contrast to the report's typed narrative and the defendants' testimony, Flournoy's two sons and the remaining occupant of the apartment all testified that they heard multiple explosions during the search. Lastly, given the absence of any indicia of trustworthiness, the district court was well within its discretion to conclude that admitting the handwriting would not serve the interests of justice.

In sum, the district court did not abuse its discretion in excluding the handwritten notation and instead admitting a copy of Officer Colbenson's report that did not include the handwriting. The district court's evidentiary ruling does not provide a basis for granting Flournoy a new trial.

### C. The jury's note does not affect the validity of the verdict.

As mentioned earlier, the jury submitted with its verdict a signed note that read: "While we agree that this was a horrible instance, in our collective opinion, the errors made by the Chicago Police Department as a whole cannot fall on the shoulders of these two defendants."

Flournoy argues that this note renders the verdict "fatally defective" because it shows that the jurors' decision was (variously) the product of confusion, sympathy for the defendants, "willful disregard for the law," "deliberate refusal to follow the [c]ourt's instructions," "*de facto* jury nullification," and unidentified "impermissible extraneous considerations." She further labels the note an "admission" by the jurors that their verdict was not based on the law or the evidence.

Flournoy's argument fails for several reasons. First, contrary to Flournoy's jumbled litany of accusations, nothing in

the note's plain language suggests any misconduct by the jurors. If anything, the note appears to show that the jury carefully followed the court's instructions and dutifully applied the law to the facts as it found them. The court instructed the jury to find a defendant liable for excessive force only if Flournoy proved by a preponderance of evidence that "the particular defendant used unreasonable force." In line with that instruction—and consistent with the verdict—the jury's note indicates that, whatever errors they believed were attributable to the Chicago Police Department as a whole, Flournoy failed to show by a preponderance of evidence that the "particular defendant[s]" in question used unreasonable force.[9] The jurors should be commended—not castigated—for their apparent commitment to the rule of law in resolving what all would agree was a challenging case based on a troubling set of facts.

More to the point, though, the jury's statement does not undermine the verdict because the statement is a gratuitous observation that is immaterial to the verdict's validity. Indeed, "[f]ederal courts have long held that additional jury notations that are not directly responsive to the jury charge and verdict form are surplusage, and are to be ignored." *Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 924, 924 n.10 (5th Cir. 2000) (collecting cases); *see also Freeman v. Franzen*, 695 F.2d 485, 490 (7th Cir. 1982) (citations omitted) ("Ordinarily a recommendation from the jury is disregarded, and does not impeach the

---

[9] Flournoy's initial complaint included a *Monell* claim against the City of Chicago Police Department, *see Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), but Flournoy voluntarily dismissed that claim with prejudice before trial.

validity of the verdict."). Accordingly, the jury's note is not evidence of impropriety and does not warrant a new trial.[10]

### III. CONCLUSION

The jury's verdict is supported by the evidence, and Flournoy received a fair trial. The judgment of the district court denying Flournoy's motion for a new trial is AFFIRMED.

---

[10] The defendants alternatively argue that we should affirm based on qualified immunity. Because we uphold the jury's verdict that no constitutional violation occurred, we do not reach this alternative argument.